# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN ZAVALA, | 1:09-cv-00881-AWI-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| KEN CLARK, | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

BACKGROUND

Petitioner is currently incarcerated in the California Department of Corrections and Rehabilitation ("CDCR") following his conviction for attempted first degree murder. Petitioner was sentenced to life with the possibility of parole, plus a one year sentence enhancement. Petitioner does not challenge the validity of his judgment; rather, he challenges the Board of Parole Hearings' (hereinafter "Board") 2008 decision finding him unsuitable for parole. Petitioner contends the Board's decision resulted in a violation of his due process rights.

On July 9, 2008, Petitioner filed a petition for writ of habeas corpus in the San Bernardino County Superior Court, challenging the Board's 2008 decision. (Exhibit 1, to Answer.) The superior court denied the petition on July 17, 2008. (Exhibit 2, to Answer.) The court found there was some evidence to support the Board's conclusion that Petitioner was not

1  suitable for parole.  (Id.) The court cited the circumstances of the commitment offense,
2  Petitioner's social history, prior criminal conduct, conduct while in prison, psychological report,
3  and parole plans.  (Id.)
4        Petitioner raised the same claims to the California Court of Appeal and California
5  Supreme Court.  (Exhibits 3 & 4, to Answer.)  Both petitions were summarily denied.  (Exhibits
6  5 & 6, to Answer.)
7        Petitioner filed the instant petition for writ of habeas corpus on May 11, 2009.  (Court
8  Doc. 1.)  Petitioner contends that (1) the denial of parole suitability was arbitrary and capricious
9  because there is no evidence to support the finding that he would pose an unreasonable risk of
10  danger to public safety; (2) the parole suitability requirements have all been met; and (3) the
11  Board has improperly changed his parole eligibility status as ordered by the court.  Respondent
12  filed an answer to the petition on July 21, 2009. (Court Doc. 16.)  Petitioner did not file a
13  traverse.

14  STATEMENT OF FACTS[1]

15        On September 6, 1993, officers were traveling southbound on Mount Vernon Avenue in
16  San Bernardino.  As the officer slowed for a red light, he heard approximately eight to ten
17  gunshots just east of him on Ninth Street.  He observed muzzle flashes coming from the south
18  side of the street.  As he approached, he could see several Hispanic males pulling weapons and
19  pointing them at another Hispanic male, victim Emilio Acuna, on the south sidewalk.  When the
20  officer was within approximately 125 feet, the suspects turned and ran across the street and got
21  into a large white Chrysler vehicle.  The vehicle immediately began to accelerate at a high rate of
22  speed without turning on the headlights.  Officers pursued the vehicle and found it on a sidewalk,
23  resting against a four-foot high chain link fence.  Petitioner was observed running from the
24  vehicle.  Approximately thirty minutes later, Petitioner was located hiding in a doghouse.  Emilio
25  Acuna suffered several small pellet wounds to his face, chest, stomach, arms, and left fingers and
26  legs, caused by a shotgun-type weapon.

---

28  [1] This information is taken from the Transcript of the Board's 2008 hearing which quoted the 2007 Board hearing.

(Exhibit B to Petition, Transcript at 11-12.)

## DISCUSSION

### I. Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

II.    Review of Petition

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability. Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987).

"In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128.  In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence.  Id.  Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board.  Id., *citing* Superintendent v. Hill, at 455-56.  Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both

5

situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the Board is guided by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner was provided all that is required.  Petitioner was given advance notice of the hearing, he was offered representation by counsel at the hearing, he was granted an opportunity to submit materials for the Board's consideration and an opportunity to be heard during the hearing, and he was provided a written decision explaining the reasons why parole was denied.  See Petition, Exhibit B.

The California Supreme Court clarified the standard of the review applicable to parole decisions by the Board or Governor in In re Lawrence, 44 Cal.4th 1181 (2008).  The applicable standard "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." Id. at 1212 (emphasis in original and citations omitted).  As to the circumstances of the commitment offense, the Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in

>the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.[2]

At Petitioner's 2008 hearing, the Board found him unsuitable based on the following factors: (1) the circumstances of the commitment offense; (2) unstable social history; (3) prior criminal conduct including selling and using various narcotics; (4) institutional behavior; (5) inadequate participation in programs for understanding his alcohol and drug abuse problem; and (6) uncertain parole plans.

With regard to the commitment offense, it does not appear there is some evidence to support the Board's finding that it was committed in a manner which demonstrated a callous disregard for human suffering. The evidence before the Board demonstrated that one of the occupants of the vehicle in which Petitioner was a passenger fired several shots at the victim, then fled the scene at a high rate of speed and ran from police. It was undisputed that Petitioner was not the shooter, and he claims to have been passed out in the backseat of the car unaware of the shooting. The Board noted that it was never proven that Petitioner was the shooter and stated it was "very hard to pinpoint exactly whether or not you knew what was going to happen and what was take - - what was taking place." (Exhibit B to Petition, Transcript, at 20, 80.) Nonetheless, the Board repeatedly faulted Petitioner for fleeing the scene after the shooting. Based upon this record, there is not some evidence to support the Board's finding that the commitment offense was carried out in a manner which demonstrated a callous disregard for human suffering simply because Petitioner fled the scene after the shooting.

However, some evidence supports the Board's findings that Petitioner (1) had an unstable social history; (2) engaged in serious misconduct in prison; and (3) needed to participate further

---

[2] To this end, the Court recognized that its prior determination of "a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness, the manner in which courts apply the some evidence standard in evaluating the evidentiary value of the gravity of the commitment offense requires some clarification." In re Shaputis, 44 Cal.4th 1241, 1254 (citing Lawrence, 44 Cal.4th at 1213-1214.)

7

in programs for understanding and dealing with alcohol and drug abuse.

Petitioner has suffered three rules violation reports (CDC-115)-the most recent in January of 2003.[3] (Exhibit B to Petition, Transcript at 31.) In 2001, Petitioner tested positive for being under the influence of marijuana. (Id.) Although not of a serious nature, Petitioner also suffered three counseling chronos (CDC-128)-the most recent in 2001 for performance.[4] (Id.) 15 Cal. Code Regs. § 2402(c)(6). The Board expressed concern regarding Petitioner's 2001 violation for using marijuana because of his lack of insight into the relapse, stating,

> I'm still not too convinced, however, that you really understand why you got the 115 back there for the dirty test back in 2001. I think you really need to take a look at that, and it's not just because you smelled it or you saw it and you just had it and you had to have it. There's got to be another reason why you did that. And that's one of the things, as you recall, that we talked about the last time, was that you need to determine why you went back and got those drugs and why you even had it close to you. Because until that time, you can go to a party, you can go anywhere and if it's - - if you got the urge to do it, you're going to do it and you really need to take a good look at yourself as to why you did that.

(Exhibit B, Transcript at 84-85, Decision at 7-8.)

Some evidence supports the Board's finding that Petitioner had an unstable social history, engaged in serious misconduct in prison, and needs further participation in alcohol/drug abuse programming as his gains are recent. Petitioner became involved in a gang at the age of 13 and continued to the time of the commitment offense-approximately eleven years. Petitioner admitted that shootings were a common occurrence in the gang lifestyle which lead to retaliation by rival gang members. He dropped out of school in the eleventh grade. Petitioner began using drugs at age 14 including PCP and cocaine and drank alcohol on a regular basis and had been drinking the entire day of the commitment offense. (Transcript, at 28.) In addition, Petitioner admitted to selling drugs. (Id. at 29-30.) Alcohol certainly played a pivotal role in the commitment offense, as Petitioner continues to claim that he was passed out in the back seat of the car. Although the psychological report was generally favorable, it was conditioned upon Petitioner refraining from alcohol and/or drug use and participation in AA/NA with a sponsor.

---

[3] A CDC-115 documents misconduct which is a violation of law or which is not minor in nature. 15 Cal. Code. Regs. § 3312(a)(3).

[4] A CDC-128 documents minor misconduct. 15 Cal. Code Regs. § 3312(a)(2).

8

(Exhibit B to Petition, Transcript at 43.)  Petitioner did not begin participation in AA/NA until 2004-despite the fact that his life term began eleven years earlier in 1993.  Thus, given Petitioner's substantial history of alcohol and drug abuse, drug-relapse in 2001, and recent participation (only four years prior to hearing date) in programming, there is some evidence to support the Board's finding that a longer period of programming is necessary to determine whether Petitioner remains a threat to public safety.  15 Cal. Code Regs. § 2402(b).

With regard to the Board's finding that Petitioner did not have sufficient parole plans upon release for failing to obtain a solid job offer, there is not some evidence to support this finding.  In rendering its decision, the Board stated:

> On your parole plans, you did have a viable residential plans, but they need to be firmed up a little bit.  You're all over the place.  You can go to Oxnard.  You can go to San Bernardino.  You got a girlfriend that, you know - - you got a young lady that's interested in you, that you may not necessarily be as interested in her as she is in you, but you can stay there.  Well, that's a - - that's a - - something that's waiting - - a disaster waiting to happen there too, because if you don't care as much for her as she do for you, you know, you're creating a problem for yourself even before you get out.  But you have other relatives up in Oxnard.  Now one of the things that we didn't get, and Deputy Commissioner Lushbough mentioned to me, the fact that we didn't have anything from your parent, from your mother.  There was no letter from your mother in here this time.
> ....
> . . . Now, also on your employment plans, when you - - somebody hires you for a job, and I realize and I do about 16 of these hearings a week on an average.  And everybody has got a cousin or an uncle or somebody that's going to get them hired.  Unless they are the ones that write the check, it's not good enough.  Because they may not have the juice that they would like for you to believe they have the juice.  And they can recommend.  You know if they come with something, I'm going to recommend you for a job and the guy has indicated that he's going to hire him based on my recommendations, it's a little different situation.  But you also should know exactly what you're going to be doing.  You know just to say I'm going to be - - well, I'll sweep floors eight hours a day, making $10.00 an hour.  You got some *very marketable skills*.  You have Graphic Arts.  You got Auto Body and Paint.  Both of those are things that you can take with you and find jobs in those type of categories instead of going out there being a - - Let's see, what did they tell you they were going to be?  I don't recall what it was, but it had nothing to do with that.  It was going to be something in - - a sign company.  Young Electric Sign Company or something.  Now once you graduate from Electronics, if there's an electronic component to that, then they should start talking to you about being - - doing something in electronics.  But then again, just tighten it up somewhat, because right now, it's just too disjointed.  But you do have *some marketable skills and you're working towards another vocation in electronics*.

(Exhibit B to Petition, Transcript at 88, Decision at 11.) (Emphasis added.)

The regulations do not require a "solid offer of employment"; instead, it requires only that

9

1 the prisoner "has made realistic plans for release or has developed marketable skills that can be
2 put to use upon release." 15 Cal Code Regs. § 2402(d)(8).[5] There is no mention or requirement
3 of a job offer.  Although Petitioner did not have a *definite* job offer, he did have marketable skills
4 and realistic employment possibilities and viable places to live.  In addition, Petitioner had viable
5 places to live including two letters from two different aunts offering residency, clothing, and
6 transportation.  Petitioner also had a letter from a girlfriend offering her residence in San
7 Bernardino County. (Exhibit B to Petition, Transcript at 47, 50-52.)  Therefore, contrary to the
8 Board's finding, Petitioner had both "realistic plans for release" and "marketable skills that can
9 be put to use upon release."

10 The Board also considered and commended Petitioner for upgrading his programming,
11 completion of Graphic Arts and enrollment in the electronic program, participation in self-help
12 programs including, Beyond Anger, Creative Conflict Resolution, and enrollment in a parenting
13 class and Alcoholic and Narcotics Anonymous. (Exhibit B to Petition, Transcript at 90, Decision
14 at 13.)

15 Petitioner's claim that the Board improperly changed his parole eligibility as ordered by
16 the sentencing court, is without merit.  Petitioner's claim is based on a misunderstanding of the
17 holdings of Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 542 U.S.
18 296 (2004).  In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the Supreme
19 Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty
20 beyond the prescribed statutory maximum upon finding, by a preponderance of the evidence, that
21 the defendant "acted with a purpose to intimidate an individual or group of individuals because
22 of race, color, gender, handicap, religion, sexual orientation, or ethnicity." Apprendi v. New
23 Jersey, 530 U.S. at 469.  The Supreme Court reversed, holding that "any fact that increases the
24 penalty for a crime *beyond the prescribed statutory maximum* must be submitted to jury, and
25 proved beyond a reasonable doubt." Id. at 490. (Emphasis added.)   In Blakely v. Washington,
26 542 U.S. 296, 124 S.Ct. 2531 (2004), the Court explained that the "statutory maximum" for

---

[5] This determination is listed as a parole suitability factor, not unsuitability factor.

10

*Apprendi* purposes is the "maximum" sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum " is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional facts." Id. at 303-304. In Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856,871 (2007), the Supreme Court held that a California judge's imposition of an upper term sentence based on facts found by the judge rather than the jury violated the Constitution.

Petitioner did not have a constitutional right to a jury trial or to proof beyond a reasonable doubt at his parole hearing. See United States v. Knights, 534 U.S. 112, 120 (2001) ("trial rights to a jury and proof beyond a reasonable doubt" inapplicable to probation revocation proceedings); United States v. Huerta-Pimental, 445 F.3d 1220, 1225 (9th Cir. 2006) (no right to jury trial to determine whether defendant violated conditions of supervised release). Moreover, the rationale underlying Apprendi does not apply to indeterminate sentencing within the statutory range. See Blakely, 542 U.S. at 309 ("Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence-and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.") (emphasis in original). Furthermore, Apprendi and its progeny is inapplicable in this instance because by denying Petitioner parole the Board did not increase his sentence beyond the statutory maximum. Petitioner was sentenced under California law to a life term, and the Board did not utilize any fact to enhance his sentence beyond the statutory maximum.

In sum, given the totality of the Board's findings, and considering the role that substance abuse and an unstable social history played in the attempted murder, and the only recent efforts to rehabilitate, there is some evidence that Petitioner is currently a threat to public safety. Thus, even if the Board could not have relied on Petitioner's commitment offense and lack of sufficient parole plans, the Board's decision is supported by other evidence in the record. See Sass v. California Bd. Of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) ("relevant question is

whether there is any evidence in the record that could support the conclusion reached"); see also Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003) (although several of the Board's reasons were not supported by some evidence, the fact that there was some evidence to support one of the reasons was sufficient to deny parole).  Accordingly, the superior court's decision is not contrary to or an unreasonable application of clearly established Supreme Court authority, nor is it an unreasonable determination of the facts in light of the evidence.  28 U.S.C. § 2254(d)(1), (2).

<u>RECOMMENDATION</u>

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     The instant petition for writ of habeas corpus be DENIED; and

2.     The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:    **September 16, 2009**                    **/s/ Dennis L. Beck**
                                                    UNITED STATES MAGISTRATE JUDGE